| | |
|---|---|
| MARK MANSA,<br>        Plaintiff,<br><br>        v.<br><br>UNITED STATES OF AMERICA,<br>        Defendant. | No. 3:16-cv-644 (VAB) |

**RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT**

While on supervised release from prison, in a community-based Transitional Drug Abuse treatment program, Mark Mansa ("Plaintiff") tested positive for "Morphine" on a mandatory drug test. Compl., ECF No. 1, ¶¶ 3–6, 7–8; Brief in Opp. to Mot. for Summ. J., ECF No. 24, at 1, Ex. 5 [Alere Toxicology Serv. Inc., Results of Controlled Substance Test: Mark Mansa (June 12, 2014)] ("Alere Toxicology Serv., Inc. Controlled Substances Test"); Def. Mot. to Dismiss or for Summ. J., ECF 23, at 6.

Mr. Mansa's positive test disqualified him from community-based treatment services ("CTS") and Residential Reentry Center ("RRC") programs and made him "ineligible to receive a reduction in sentence under 18 U.S.C. § 3621(e)(2)(B)." Def. Mot. to Dismiss or for Summ. J. at 9, 13, Ex. 1h. He was removed from his community placement and detained in The Donald W. Wyatt Detention Facility in Rhode Island for five and a half months. Compl. at ¶14; Brief in Opp. to Mot. for Summ. J. at 2.

Mr. Mansa has now sued the United States of America ("Defendant" or the "Government") under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), *et. seq.*, Compl. at ¶ 1, alleging that his positive test result fell below "Federal Bureau of Prisons' cutoff level for an

opiate marker in a urine sample", and that he was wrongfully imprisoned and "suffered physical pain and discomfort and loss of freedom as a direct and proximate consequence of his imprisonment by defendant." *Id.* at ¶¶ 10, 15.

The Government now moves for summary judgment. Def. Mot. to Dismiss or for Summ. J., ECF 23.[1]

For the reasons discussed below, the Court now **GRANTS** Defendant's motion for summary judgment, ECF No. 23.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Allegations[2]

On June 1, 2012, Mr. Mansa received a sentence of forty-six months imprisonment for one count of possession with intent to distribute 100 kilograms or more of marijuana. Compl. ¶ 3. On July 6, 2016, Mr. Mansa began serving his sentence. *Id.* On or about May 6, 2014, when Mr. Mansa had served twenty-two months of his sentence, he was transferred to a Residential Reentry Center ("RRC") in Waterbury, Connecticut. Compl. at ¶ 4.

Later that month and while still on supervised release from prison, Mr. Mansa began working in New York City. Brief in Opp. to Mot. for Summ. J., ECF No. 24, at 1; Ex. 1, ECF

---

[1] While the Government characterizes this motion in the alternative, either a motion to dismiss or a motion for summary judgment, because the Court previously addressed the Government's motion to dismiss and this motion is filed after discovery and under Rule 56 of the Federal Rules of Civil Procedure, as well as under Rule 12, the Court will treat this motion as a motion for summary judgment and apply Rule 56's standard to this motion. Fed. R. Civ. P. 12, 56.

[2] The Court presumes the parties' familiarity with the facts as set forth in its March 30, 2017 ruling on Defendant's motion to dismiss, and incorporates those facts by reference herein. The Court sets forth only those facts deemed necessary to an understanding of the issues raised in, and decision rendered on, this motion. The following facts are taken from the Complaint, Plaintiff's brief in opposition to the motion for summary judgment and exhibits thereto, Defendant's motion to dismiss or for summary judgment and exhibits thereto, and Defendant's amended reply brief. ECF No. 27.

No. 24-2 [Deposition of Mark Vincent Mansa, extracted (Feb. 23, 2018)] ("Dep. of Plaintiff"), at 37. His employer allegedly gave him rolls and sandwiches "garnished with poppy seeds." Dep. of Plaintiff at 37. At first, Mr. Mansa allegedly did not realize he was eating poppy seed rolls. *Id.*, Ex. 1 at 39–40.

On May 28, 2014, Mr. Mansa tested positive for "Morphine" on a test with a screen cut-off of 300 ng/mL and a confirmation cut-off of 200 ng/mL. Alere Toxicology Serv., Inc. Controlled Substances Test. On June 4, 2014, he called his RRC ("the Chase Center") to report that he had consumed a hard roll that contained poppy seeds. *Id.*, Ex. 3, ECF No. 24-4 [Incident Report, Community Solutions Inc. (June 19, 2014)]. A Chase Center counselor allegedly told Mr. Mansa not to worry because he would need to "eat a whole case . . . or a whole boxful" of poppy seed rolls or bagels to test positive. Dep. of Plaintiff at 35–36. On June 12, 2014, the results of Mr. Mansa's positive controlled substance test were reported. Alere Toxicology Serv., Inc. Controlled Substances Test.

A week or two later, a staff member from the RRC called Mr. Mansa to tell him he was being sent back to prison. *Id.* at 24. Mr. Mansa allegedly offered to submit to a "gas chromatography test" at his own expense. *Id.* at 25. A RRC staffer allegedly discouraged Mr. Mansa from pursuing the additional "hair test" on his own. *Id.* Nevertheless, on July 2, 2014, Mr. Mansa submitted a hair sample for testing. *Id.*, Ex. 4, ECF 24-5.[3] That test yielded a negative result for opiates at a screening cut off of 200 pg/mg. *Id.* Still, Mr. Mansa was incarcerated for

---

[3] Plaintiff's exhibit 6 states that "the maximum length[] of time, after last use, that a person's urine would be positive for . . . . Opiates is 6 days." Brief in Opp. to Mot. for Summ. J., Ex. 6 (alterations in original). By contrast, Plaintiff believes that a "hair test . . . . goes back nine months for any drug use." Dep. of Plaintiff at 21.

five and a half months for failing his CTS and RRC programs. Compl. at ¶14; Def. Mot. to Dismiss or for Summ. J. at 9, 13, Ex. 1h; Brief in Opp. to Mot. for Summ. J. at 2.

Mr. Mansa claims that a positive urinalysis result for 200 ng/mL of "Morphine" was insufficient to justify his detention under Bureau of Prison ("BOP") policies. Brief in Opp. to Mot. for Summ. J. at 5; *see also*, Ex. 6, ECF No. 24-7 [Residential Reentry Center, "Statement of Work" Manual: Attachment C (Aug. 2007)]. Mr. Mansa contends that BOP rules "expressly provided that a drug screen level less than 300 ng/ml was *not* evidence of opiate ingestion." *Id*. In support of this argument, Mr. Mansa submits a table entitled "Urinalysis Procedures"; it is allegedly an attachment to the Residential Reentry Center's August 2007 Statement of Work manual. Brief in Opp. to Mot. for Summ. J. at Ex. 6. Mr. Mansa claims that BOP procedures—as published "in the Statement at Work . . . on any federal website . . . . [and in] the law"—set a minimum threshold for a positive result as 300 ng/mL. Dep. of Plaintiff at 23.

The Government argues that Mr. Mansa knew that he could be disciplined for a positive drug test, at any level. The Government also argues that it made a reasonable decision, based on BOP policy and related to legitimate health and safety concerns, to remove Mr. Mansa from the community following his positive toxicology screening. The parties agree that Mr. Mansa  was afforded—and prevailed on—an appeal of his re-incarceration.

### 1.  Notice Evidence

The Government alleges that Mr. Mansa knew that he could be disciplined for a positive drug test, even if it was caused by poppy seed consumption. Def. Mot. to Dismiss or for Summ. J. at 6. In support of this claim, the Government submits five exhibits.

First, there is the "Community Based Program Agreement", which states:

> I understand that urinalysis or other Bureau of Prisons authorized testing to detect unauthorized drug or alcohol use may be required as a condition of residence in a residential re-entry center or work release program, and if required, I agree to submit to such testing. I understand that ingestion of poppy seed products may result in positive test results for unauthorized drug use and is therefore prohibited.

*Id*. at Doc. 2a, ECF No 23-9, U.S. Dept. of Justice/Fed. Bureau of Prisons, Community Based Program Agreement [BP-A0434, Rev. June 2010 (Oct. 16, 2013)]. On October 16, 2013, Mr. Mansa signed the Community Based Program Agreement. *Id*.

Second, there is the "Adult Work Release Client Handbook", which states:

> We expect you to remain drug and alcohol free during your placement. You are not to consume poppy seeds, or quinine in any form, including tonic water[.] These substances may result in a false positive drug test. All positive drug tests are treated as the result of the use of illegal drugs[.] Positive results will be considered conclusive evidence of drug or alcohol use.

*Id*. at Doc. 2b, ECF No 23-9, Community Solutions, Adult Work Release Client Handbook (Rev. May 2012) at 17. On May 6, 2014, Mr. Mansa signed a "Handbook Sign-off" attesting that he had received and read the handbook, and that he understood the "behavioral responsibilities and potential sanctions" described in the handbook. *Id*. at Doc. 2c, Community Solutions, Inc. Handbook Sign-off.

Third, there is a signed "Client Orientation Checklist", which states: "Prohibition on use of drugs, alcohol, poppy seeds, quinine water, tonic water, medicated inhalers or any inhalers without a prescription, including Vicks and Benedrex inhalers." *Id*. at Doc. 2d, ECF No 23-10, Community Solutions, Inc., Client Orientation Checklist [Rev. Nov. 2007 (May 6, 2014)].

Fourth, there is a "Conditions of Furlough" form, which states:

> It has been determined that consumption of poppy seeds may cause a positive drug test which may result in disciplinary action. As a condition of my participation in community programs, I will not consume any poppy seeds or items containing poppy seeds.

*Id.* at Doc. 2d, ECF No 23-10, Fed. Bureau of Prisons, Conditions of Furlough (March 16, 2014).

Mr. Mansa signed that document on March 16, 2014. *Id.*

Fifth, there is the "Conditions of Home Detention" form, which states:

I will submit to urinalysis or alcohol testing as requested by the RRC/Probation. I understand that the ingestion of poppy seed food products may result in positive test results for unauthorized drug use and is therefore prohibited.

*Id.* at Doc. 2d, ECF No 23-10, U.S. Dept. of Justice/Fed. Bureau of Prisons, Conditions of Home Detention [BP-A0460, Rev. June 2010 (June 2, 2014)]. Mr. Mansa signed that document on June 2, 2014. *Id.*

## 2. Decision-Making Evidence

The Government also argues that it made a reasonable decision, based on BOP policy, to remove Mr. Mansa from the community following his positive toxicology screening. In support of this claim, the Government submits three groups of exhibits.

First, there is the U.S. Dept. of Justice/Bureau of Prisons "Incident Report" following Mr. Mansa's positive drug test. The report characterizes the positive urine sample as a violation of a program requirement:

On 05/28/14 at 8:25pm FBOP Mark Mansa #20377-014 rendered a urine sample #R4269484. On 6/12/14 results returned from Alere Toxicology Services positive for Morphine. Inmate Mansa signed the chain of custody certifying it was his urine. Inmate Mansa violated his CTS requirement. Inmate Mansa is required to attend CTS and is 3621E.

*Id.* at Doc. 2d, U.S. Dept. of Justice/Fed. Bureau of Prisons, Incident Report [BP-A205.073, Rev. Aug. 1999 (06/12/2014 12:20pm)], ECF No. 23-10.

Second, there are documents related to the Chase Center's review of Mr. Mansa's disciplinary infraction. On June 16, 2014, Case Manager Supervisor Jessica Dickson issued an

investigation report. *Id.* Jessica Dickson, Investigation Report [BP number unknown, (06/16/2014 9:00am)]. The report notes that "inmate Mansa stated that he ate poppy seeds," that his boss provided corroborating documentation, and that "CMS Doug Arpin" and Mr. Mansa had informed Alere and provided documented that poppy seed consumption could alter urine samples. Id. Ms. Dickson also noted that "[i]nmate Mansa signed off on paperwork stating that he would not consume poppy seeds or anything that would alter a urine sample." *Id.* Given those facts, Ms. Dickson recommended that the incident be referred to the Center Discipline Committee:

> [T]hat the charge of Use of Drugs/Drug Items/Alcohol Intoxicants is the appropriate charge for this incident, based upon Inmate Mansa testing positive for morphine and signed paper work[] stating that he would not consume any products that would alter his urine is valid and supported. It is the investigator[']s recommendation that this incident report be referred to the CDC.

*Id.* That same day, Ms. Dickson referred Mr. Mansa's case for a disciplinary hearing. *Id.*, U.S. Dept. of Justice/Fed. Bureau of Prisons, Notice of Center Discipline Committee Hearing [BP-S2707.073, Rev. Mar. 1994 (June 16, 2014)], ECF No. 23-10. The Center Disciplinary Committee corroborated Ms. Dickson's findings and recommended "Loss of Good Time." *Id.*, U.S. Dept. of Justice/Fed. Bureau of Prisons, Center Discipline Committee Report [BP-A208.073, Rev. Mar. 1994 (June 24, 2014)]. The Center Discipline Committee's recommendation was sent to Chad Fultz, the Residential Reentry Manager overseeing the Chase Center RRC contract. Def. Mot. to Dismiss or for Summ. J., ECF 23, at 11.

Third, there is the signed declaration from Residential Reentry Manager Chad Fultz, the official responsible for ordering Mr. Mansa's re-incarceration. *Id.*, Doc. 2g [Declaration of Chad Fultz (May 30, 2017)], ECF No. 23-8. In the declaration, Mr. Fultz explained that he had discretion to "determine [that] an inmate's continued placement in the RRC [was] no longer appropriate." *Id.*

at ¶ 1, 4. Mr. Fultz alleges that he reviewed the Incident Report, Center Discipline Committee report and hearing findings. *Id*. at 3–4. Mr. Fultz then states that he decided to order Mr. Mansa's removal from the community for policy, health, and safety reasons:

> As the RRM who was responsible for contract oversight and contract monitoring . . . I determined Mr. Mansa's removal from the RRC was appropriate[.] I made decisions that I believed to be in the best interest of the government, staff, inmates, and the contract[.] Instrumental in my decision to transfer Mr. Mansa from the RRC to a secure facility was the fact Mr. Mansa was a federal inmate who had been transferred into community custody for pre-release programming and who was also participating in the Bureau of Prisons Drug Abuse Treatment program. Prior to testing positive for Morphine, he signed and/or received no less than five forms and/or notices advising him that he was subject to urine surveillance, and because the ingestion of poppy seeds could cause a urine sample to test positive for drugs, he was not permitted to ingest poppy seeds[.] Because inmates receive multiple warnings regarding poppy seed ingestion, I typically do not question the finding of a CDC or DHO that is based upon a valid positive drug test result. To freely permit staff to overturn disciplinary charges for Use of Drugs after an inmate asserts that he/she ingested poppy seeds, would possibly increase the potential for staff corruption and encourage inmates to take drugs knowing the charge could be expunged if they were to assert that they ingested poppy seeds. These concerns are especially true when I must determine whether an inmate who is participating in a drug treatment program is appropriate for continued RRC placement after he or she tests positive for drug use. Because inmates participating in community programs have greater access to drugs and alcohol than inmates who are housed at secure facilities, the risk of repeated violations, violence, and disruptive conduct in the RRC or the community are factors I must consider when determining whether an inmate who tests positive for drugs is appropriate for continued RRC placement.

*Id*. at 5–6.

Mr. Fultz's decision to deny Mr. Mansa's continued RRC placement prompted Community Treatment Coordinator Erik Anderson to issue a "Request for Removal of Provisional § 3621(e)" form (i.e., sentence reduction under 18 U.S.C. § 3621(e)(2)(B)). U.S. Dept. of Justice/Bureau of Prisons, Request to Delay, Remove of Reinstate Early Release [BP-A0768, Rev. June 2010 (June 30, 2014)], ECF No. 23-6. Mr. Anderson explained the rationale for Mr. Mansa's removal from the community as:

> The inmate cannot fulfill the requirements for CTS completion because he received an incident report on May 28, 2014 for Code 112: Use of any narcotics, marijuana, drugs, alcohol, intoxicants, or related Paraphernalia, not prescribed for the individual by medical staff (tested positive for Morphine). He is no longer able to participate in CTS making him ineligible for a 3621 (e) release.

*Id.*

On July 14, 2014, Mr. Fultz issued a transfer order to the U.S. Marshals Service for Mr. Mansa, attesting that Mr. Mansa was suitable for transfer to a "Minimum/In" custodial setting. U.S. Dept. of Justice/Fed. Bureau of Prisons, Transfer Order [BP-S399.058, Rev. May 1994 (July 14, 2014)], ECF 23-11.

### 3. Appeals Process Evidence

Following the July 14, 2014 transfer order, *id.*, Mr. Mansa was removed from the community and transported to the Wyatt Detention Center in Rhode Island. Compl. at ¶14; Brief in Opp. to Mot. for Summ. J. at 2. Mr. Mansa then filed a regional appeal. Mark Mansa, DHO Appeal of Incident Report No. 2597485, ECF 23-6; J. L. Norwood, Decision on Appeal No. 787778-Rs, Aug 29, 2014 ("Norwood Decision"), ECF No. 23-6. Mr. Mansa's appeal was denied by Regional Director J.L. Norwood on August 23, 2014. Norwood Decision at 2. Director Norwood stated his reasons for decision as:

> The CDC reasonably determine you committed the prohibited act [.] Your argument that the positive test should be ignored because you submitted a report from another laboratory that tested a hair sample without negative results is without merit. Laboratory testing, typically of a urine sample, must be performed by a BOP-approved laboratory. This ensures the contracted facility performs at the required standards for numerous issues, including but not limited to screen testing, conformation testing, reporting, and chain of custody. Your argument your sample was not retested. . . is also without merit. Program Statement 6060.08 . . . requires a BOP-approved laboratory upon detecting a positive test to perform a confirmation test before reporting the result to the institution. The record reveals that was done in this case. Specifically, your sample was initially screened and tested positive for morphine with a cut-off of 300 ng/mL. A confirmation test was administered and the sample again tested positive with a cut-off of 200 ng/mL [.] The decision of the

CDC was based upon the greater weight of the evidence, and the sanctions imposed by the DHO were consistent with the severity level of the prohibited act.

*Id*.

On September 8, 2014, Mr. Mansa appealed the Regional Director's decision. Federal Bureau of Prisons, Central Office Admin. Remedy Appeal: Mark Mansa, Sept. 8, 2014, ECF No. 23-6.

On December 3, 2014, Mr. Mansa prevailed in his appeal. Def. Local Rule 56(a) Statement ¶ 56; *see also*, U.S. Dept. of Justice/Fed. Bureau of Prisons, Request to Delay, Remove or Reinstate Early Release [BP-A0768, Rev. June 10 (Dec. 3, 2014)], ECF No. 23-7. Following the successful appeal, Community Treatment Coordinator Erik Anderson issued a "Request for Reinstatement of Provisional § 3621 (e)" (i.e., release from detention form). U.S. Dept. of Justice/Fed. Bureau of Prisons, Request to Delay, Remove or Reinstate Early Release [BP-A0768, Rev. June 10 (Dec. 3, 2014)], ECF No. 23-7. In the reinstatement request, Mr. Anderson explained: "The 112 incident report was modified based on an appeal. Inmate Mansa was found guilty of a 309, violating a condition of a community program. He is eligible to return to the RRC and his 3621e status should be reinstated [.]" *Id*. One week after Mr. Anderson's request, Mr. Mansa was released from the Wyatt Detention Center to the RRC. Def. Mot. to Dismiss or for Summ. J. at 14. Two weeks after that, on Christmas Eve, Mr. Mansa was placed on home confinement. *Id*.

**B. Procedural Background**

On December 29, 2015, Mr. Mansa, through his attorney, filed a claim with the Federal Bureau of Prisons. Claim for Damage, Injury, or Death, ECF No. 23-4.

On January 4, 2016, the Federal Bureau of Prisons denied Plaintiff's "administrative tort claim . . . [for] loss of liberty and unlawful confinement" because Plaintiff had "not alleged a physical injury actionable under the Federal Tort Claims Act." U.S. Dept. of Justice, Letter Re: Administrative Claim No. TRT-NER-2016-01575, Jan. 4, 2016, ECF No. 23-4. The letter stated that Plaintiff could appeal the decision within six months of January 4, 2016 in "an appropriate United States District Court." *Id*.

On April 25, 2016, Mr. Mansa sued the Government under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), *et. seq.*, alleging negligence on the part of BOP officials acting in their official capacities. Compl. at ¶ 1. He claims that his positive test result fell below "Federal Bureau of Prisons' cutoff level for an opiate marker in a urine sample", and that he was wrongfully imprisoned and "suffered physical pain and discomfort and loss of freedom as a direct and proximate consequence of his imprisonment by defendant." *Id*. at ¶¶ 10, 15.

The Government moved to dismiss the Complaint under Rules 12(b)(1) and (b)(6). Def. Mot. to Dismiss, ECF No. 9. The Court denied the motion to dismiss under 12(b)(1) ("Mr. Mansa's Complaint could be read to state a claim for ordinary negligence that involves no prison policy determinations") and 12(b)(6) ("Defendant . . . argu[es] that the 'complaint fails to state a claim for false imprisonment, because Plaintiff was legally confined, and the BOP has the authority to transfer [an] inmate into any correctional facility.' Because Mr. Mansa has clarified that he claims only common law negligence, the Court need not engage with this argument.") Ruling on Def. Mot. to Dismiss, ECF No. 12, at 8–9.

Following discovery, the Government now moves for summary judgment. Def. Mot. to Dismiss or for Summ. J., ECF 23.

On December 18, 2019, the Court held a hearing on Defendant's motion for summary judgment. Minute Entry, ECF No. 30. At the hearing, the Government asked leave to submit exhibits relating to the Bureau of Prison's cut-off level for opiate tests for incarcerated persons or parolees. *Id*. The Court instructed the Government to docket the exhibits. *Id*. That day, the Government docketed the exhibits. Supp. to Reply for Mot. to Dismiss and/or for Summ. J., ECF No. 31. The next day, Defendant objected to the submission and asked the Court to strike the document from the record. Resp, to Defs. Supp. Reply Br., ECF No. 32.

## II. STANDARD OF REVIEW

In a motion for summary judgment, the moving party must establish that no genuine issues of material fact remain in dispute and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law" and a factual issue is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In reviewing the record, a court must "construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Gary Friedrich Enters., L.L.C. v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir.2013) (citations omitted).

If there is any evidence in the record from which a reasonable factual inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is inappropriate. *See Security Insurance Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir.2004); *Anderson*, 477 U.S. at 250 (summary judgment is proper only when "there can be but one reasonable conclusion as to the verdict").

## III. DISCUSSION

As the Court previously ruled, Mr. Mansa's remaining claim is properly construed as a claim for ordinary negligence under the Federal Tort Claims Act ("FTCA"). Ruling on Def. Mot. to Dismiss at 8. His claim is permitted under the FTCA where there is "injury or loss of property . . . caused by the negligent or wrongful act or omission of any [federal] employee[s] . . . acting within the scope of his . . . employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *see also*, *Chen v. United States*, 854 F.2d 622, 626 (2d Cir. 1988) (citing *C.P. Chemical v. United States*, 810 F.2d 34, 37 (2d Cir. 1987)).

Recoveries in negligence are limited by exceptions to the FTCA, most notably the "discretionary function exception." 29 U.S.C. § 2680(a). The discretionary function exception provides that the United States remains immune from suit where a claim is based on "the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 29 U.S.C. § 2680(a); *In re World Trade Ctr. Disaster Site Litig.*, 521 F.3d 169, 190 (2d Cir. 2008) (internal citations removed) ("[T]he discretionary function exception was intended to avoid any possibility that the FTCA may be construed to authorize damage suits against the Government growing out of a legally authorized activity, merely because the same conduct by a private individual would be tortious.").

The discretionary function exception applies "only if two conditions are met: (1) the acts alleged to be negligent must be discretionary, in that they involve an element of judgment or choice and are not compelled by statute or regulation and (2) the judgment or choice in question

must be grounded in considerations of public policy or susceptible to policy analysis."

*Coulthurst v. United States*, 214 F.3d 106, 109 (2d Cir. 2000) (internal quotation marks omitted).

Plaintiffs can maintain an FTCA claim against federal officials for negligence if the negligence alleged is "unrelated to any plausible policy objectives" and therefore is "outside of the scope of the discretionary function exception. *Coulthurst*, 214 F.3d at 111. Consistent with *Coulthurst*, courts have allowed prisoners to allege that federal officials negligently transferred them to a different facility, despite the discretionary function exception, as long as the negligence did not arise out of a policy determination. *See, e.g.*, *Palay v. United States*, 349 F.3d 418, 432 (7th Cir. 2003) (denying dismissal of inmate's injury claim because "as in *Coulthurst*, it is easy to imagine a scenario in which MCC officials behaved in a negligent fashion, but without making the types of discretionary judgments that the statutory exception was intended to exempt from liability. Perhaps the corrections officer monitoring the holdover unit at the time that the gang altercation broke out was simply asleep . . . . [or] left the unit unattended in order to enjoy a cigarette or a snack."); *Hartman v. Holder*, No. 100-CV-6107-ENV-JMA, 2009 WL 792185, at *11 (E.D.N.Y. Mar. 23, 2009) (denying motion to dismiss plaintiff's claim because he "does not quibble with the BOP's discretion over whether actually to transfer [him] to another location at the MDC; his is a challenge, in part, to [an official's] failure simply to relay word of his danger . . . so as to enable the discretionary evaluation of his transfer request by the official entrusted with that judgment.").

To substantiate a claim of negligence in Connecticut, a party must prove duty, breach, causation, and actual injury. *McDermott v. State*, 316 Conn. 601, 609, 113 A.3d 419, 425 (2015), quoting *LePage v. Horne*, 262 Conn. 116, 123, 809 A.2d 505 (2002) ("The essential elements of

a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury . . . . ); *Rawls v. Progressive N. Ins. Co.*, 310 Conn. 768, 776, 83 A.3d 576, 583 (2014) ("We turn next to the well established law of negligence. In order to make out a prima facie case of negligence, the plaintiff must submit evidence that, if credited, is sufficient to establish duty, breach of duty, causation, and actual injury.") "A defendant's duty and breach of duty is measured by a reasonable care standard, which is the care that a reasonably prudent person would use under the circumstances." *Rawls*, 310 Conn. at 776, *quoting Hoelter v. Mohawk Service, Inc.*, 170 Conn. 495, 501, 365 A.2d 1064 (1976) (internal citations and quotations omitted).

Mr. Mansa alleges two breaches of duty: (1) that BOP officials ignored the BOP policy establishing a minimum "cutoff level for an opiate marker in a urine sample [as] 300 ng/mL." Compl. ¶ 10; Brief in Opp. to Mot. for Summ. J. at 2 ("As predicted, his drug screen noted a positive indication of opiates. However, the level shown was less than 300 ng/ml, which is the minimum level required to indicate that an opiate had been ingested. Accordingly, the written test results submitted to the Bureau of Prisons affirmatively proved that the plaintiff had not violated the rule prohibiting the use of narcotics."), and (2) that BOP officials abused their discretion by not admitting exonerating evidence and not allowing Plaintiff to remain in the community following his low-positive urinalysis. Brief in Opp. to Mot. for Summ. J. at 2.

The Government argues that Mr. Mansa had a positive drug test and that BOP officials afforded Plaintiff a "full panoply of rights" before determining that "Plaintiff had violated BOP's Disciplinary Code 112, Use of Drugs." Def. Mot. to Dismiss or for Summ. J. at 25. The

Government claims that Mr. Mansa's expulsion from the community-based program and transfer to a secure facility did not constitute a contravention of BOP policy or breach of duty.

The Court agrees.

## A. BOP's Threshold for "Positive" Urinalysis

Mr. Mansa alleges that BOP policy established 300 ng/mL as the minimum threshold for a positive urinalysis result for opiates. In support of this claim, Mr. Mansa submits his recollection of a comment from a Chase Center counselor, a table allegedly created by the RRC, and his own interpretation of BOP policy. *See* Brief in Opp. to Mot. for Summ. J., Ex. 6 [Residential Reentry Center, "Statement of Work" Manual: Attachment C (Aug. 2007)]; Dep. of Plaintiff.

As of December 18, 2018, the Government alleges that the cut-off level for a positive opiate test for an inmate or parolee is as low as 100 ng/mL. Supp. to Reply for Mot. to Dismiss and/or for Summ. J. Mr. Mansa objects to this allegation as untimely. Resp, to Defs. Supp. Reply Br. For the reasons explained below, the Court need not, and does not, consider the Government's new filing in determining whether Mr. Mansa is entitled to relief.

Between the time of Mr. Mansa's urinalysis and the release of his "positive" test result, a Chase Center counselor allegedly told Plaintiff that he would need to "eat a whole case . . . or boxful" of poppy seed bagels or rolls to test positive for drugs. Dep. of Plaintiff at 35–36. Mr. Mansa alleges that this statement was proven false by his positive drug test.

Mr. Mansa also argues that the "positive" test result did not conform to BOP policy. He submits a table entitled "Urinalysis Procedures" to substantiate that allegation. Brief in Opp. to Mot. for Summ. J. at Ex. 6. The table contains a column entitled "Screen Level" and a row for

opiates; the relevant box or cell for opiate screen level suggests that the screen level for opiates discovered through the "enzyme multiplied immunoassay technique or a certified comparable testing technology" is 300 ng/ml. *Id*. at 8. Even after construing the table and Mr. Mansa's interpretations of BOP policies "in the light most favorable to the non-moving party and draw all reasonable inferences in its favor," *Gary Friedrich Enters., L.L.C.,* 716 F.3d at 312, the Court cannot conclude that "a reasonable jury could return a verdict" for him. *Anderson*, 477 U.S. at 248.

Mr. Mansa appears to have tested positive at 300 ng/mL. Alere Toxicology Serv., Inc. Controlled Substances Test. The test result provided to the Chase Center listed a screen cut-off of 300 ng/mL for all opiates and a confirmation cut-off of 200 ng/mL for Morphine. *See also*, Mark Mansa, DHO Appeal of Incident Report No. 2597485, ECF 23-6; J. L. Norwood, Decision on Appeal No. 787778-Rs, Aug 29, 2014 ("Norwood Decision"), ECF No. 23-6 ("Specifically, your sample was initially screened and tested positive for morphine with a cut-off of 300 ng/mL."). Mr. Mansa tested positive under these thresholds. Alere Toxicology Serv., Inc. Controlled Substances Test. Assuming *arguendo* that Mr. Mansa is alleging that the confirmation cut-off also needed to be 300 ng/mL, the Court still finds that the Government is entitled to summary judgment because Mr. Mansa has not produced admissible evidence to support his negligence claim.

Mr. Mansa's screen level table fails to support a claim of negligence for four reasons. First, Mr. Mansa's table does not refer to BOP policies. Brief in Opp. to Mot. for Summ. J. at Ex. 6. Second, Mr. Mansa's table lists the "screen level" as 300 ng/mL for a "screen method" of "enzyme multiplied immunoassay technique." Brief in Opp. to Mot. for Summ. J., Ex. 6. Mr.

Mansa's positive toxicology report does not indicate the type of test performed (e.g., enzyme multiplied immunoassay technique). Alere Toxicology Serv., Inc. Controlled Substances Test. Third, the five BOP-issued "drug use" policy documents signed by Mr. Mansa list no minimum threshold or cut-off for morphine or opiate screenings. *See e.g.*, Doc. 2a, Community Based Program Agreement ("I understand that ingestion of poppy seed products may result in positive test results for unauthorized drug use and is therefore prohibited."); Doc. 2b Adult Work Release Client Handbook ("All positive drug tests are treated as the result of the use of illegal drugs[.] Positive results will be considered conclusive evidence of drug or alcohol use."); *see also*, Doc. 2c, Community Solutions, Inc. Handbook Sign-off; Doc. 2d, Client Orientation Checklist; Doc. 2d, Conditions of Furlough; Doc. 2d, Conditions of Home Detention. Fourth, Mr. Mansa's urinalysis report indicates a "positive" result. Alere Toxicology Serv., Inc. Controlled Substances Test.

Mr. Mansa's allegation of a specific minimum threshold for a "positive" opiates result also fails as evidence of negligence. Mr. Mansa's allegation rests on a purported statement by a Chase Center counselor, the table discussed above, and Plaintiff's own interpretation of BOP policy. In the absence of any statute or regulation or testimony from a Government official laying a foundation for Mr. Mansa's proffered table or his interpretation of BOP policy as actual BOP policy, this is not admissible evidence and would properly be excluded as leading to a confusion of the issues. FED. R. EVID. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."); *Caruolo v. John Crane, Inc.*, 226 F.3d 46, 54 (2d Cir. 2000)

("District court judges enjoy wide latitude in determining whether evidence is admissible at trial; this Court reviews evidentiary rulings under a deferential abuse of discretion standard."); *Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir. 2005) ("Dawson's testimony . . . commented directly, under the guise of expert opinion, on the credibility of trial testimony from crucial fact witnesses . . . . Under such circumstances, we think it was an abuse of the district court's substantial discretion in such matters to determine that Dawson's vouching for Muirhead's and McCarthy's veracity—even were it otherwise admissible—was not prejudicial, confusing, and misleading to the jury within the meaning of Rule 403.").

In any event, there are five BOP-issued policy documents, all signed by Mr. Mansa, warning that poppy seed ingestion could yield a positive urinalysis result and that any positive urinalysis result would be treated as drug use. Further, as discussed above, it appears that Mr. Mansa did test positive at the 300 ng/mL threshold. Alere Toxicology Serv., Inc. Controlled Substances Test. As a result, no reasonable jury could find that BOP ignored its own policy cut-off or improperly charged Mr. Mansa with a disciplinary infraction. *Cf. Nieblas-Love v. New York City Hous. Auth.*, 165 F. Supp. 3d 51, 66 (S.D.N.Y. 2016) ("[B]eyond Plaintiff's own conclusory allegations, he provides no admissible evidence supporting his claim that the legitimate, non-discriminatory reasons provided for his termination were pretext for discrimination."); *Wantanabe Realty Corp. v. City of New York*, 315 F. Supp. 2d 375, 395 (S.D.N.Y. 2003) ("[A] plaintiff alleging a conspiracy must come forward with admissible evidence, whether direct or circumstantial, that would justify a reasonable jury in finding not only that the defendants acted in concert, but that they did so for the purpose of achieving the alleged objective . . . . While there is ample basis for concluding that City Hall wished to have

the roller coaster demolished, there is no evidence that any of the defendants (other than Zeid and Hilton) ever even entertained the possibility that it would be demolished without regard to its actual condition, much less embraced that as an objective. Accordingly, the substantive due process claim will be dismissed as to all defendants other than the City, Zeid and Hilton.").

### B. BOP's Exercise of Discretion

Mr. Mansa also argues that BOP officials abused their discretion by not accepting his "hair test" and by treating his low-positive urinalysis result as a drug use infraction that exposed him to re-incarceration rather than a lower level infraction that would have maintained his community placement. The Court disagrees.

At summary judgment, Mr. Mansa claims that BOP officials assured him that "a [hair] test result would exonerate him." Brief in Opp. to Mot. for Summ. J. at 2, 5. That allegation is unsupported by the record. While a counselor allegedly told Mr. Mansa, after the administration of his urinalysis test, that he would need to "eat a whole case . . . or boxful" of poppy seed bagels or rolls to test positive for drugs, Dep. of Plaintiff at 35–36, there is nothing in the record indicating that the counselor encouraged Mr. Mansa to seek additional testing on his own.

To the contrary, an RRC staffer told Mr. Mansa not to bother with the "hair test." Brief in Opp. to Mot. for Summ. J. at 25. Later, Regional Director Norwood explained the rationale for this policy to Mr. Mansa before Mr. Mansa pursued a claim through the Federal Bureau of Prisons. Claim for Damage, Injury, or Death. The policy reasons for not permitting inmates to pursue retesting through the laboratories of their choice are four-fold: (1) BOP contracts with certain facilities, (2) those facilities must comply with confirmation testing protocols, (3) those

facilities must issue specific reports, and (4) those facilities must adhere to requirements for chain of custody. Norwood Decision at 2.

Thus, the BOP policies communicated to Mr. Mansa before and after his "hair test" do not support a finding that the "hair test" would be construed as exonerating evidence by BOP officials, or even that Mr. Mansa reasonably believed that he could select the laboratory of his choice to perform the test of his choice to overturn his positive urinalysis result.

In any event, as a matter of law, "prisoners do not have a due process right to engage in secondary testing." *Abbott v. Hollingsworth*, No. CIV. 14-6784 NLH, 2015 WL 1952355, at *4 (D.N.J. Apr. 29, 2015) ("With respect to Petitioner's claim that he was not permitted to submit to a hair follicle test, his argument again fails. The procedural safeguards of *Wolff* do not guarantee a prisoner the right to present any evidence he wishes."), citing *Manfredi v. U.S.*, Civ. No. 12–1905, 2012 WL 5880343, at *6 (D.N.J. Nov. 20, 2012) (collecting cases) ("However, it appears from the petition that Petitioner also is arguing that he was not given an opportunity to obtain a second, independent lab test in violation of his due process rights under *Wolff*. *Wolff* does not, however, guarantee prisoners the unfettered right to call any witness or present any evidence they wish regardless of its relevance or necessity.")

Mr. Mansa also argues that BOP does not permit re-incarceration in cases of low-positive urinalysis results. Compl. ¶¶ 10, 15. Nothing in the record supports this allegation. Mr. Mansa submits no evidence of a two-track BOP policy for urinalysis results above or below 200 ng/mL or 300 ng/mL. By contrast, the BOP policy documents signed by Mr. Mansa permit an inference of drug use at any level. *See e.g.*, Doc 2b, Adult Work Release Client Handbook ("You are not to consume poppy seeds[.] These substances may result in a false positive drug test. All positive

drug tests are treated as the result of the use of illegal drugs[.] Positive results will be considered conclusive evidence of drug or alcohol use.").

Once Mr. Mansa tested positive for drugs, BOP officials had disciplinary discretion, so long as their decisions were "grounded in considerations of public policy or susceptible to policy analysis." *Coulthurst*, 214 F.3d at 111 ("If the plaintiff is unable to offer sufficient evidence to establish a triable issue of fact on any theory of negligence outside the scope of the DFE, then the United States will be entitled to judgment.").

In contrast to Mr. Mansa's unsupported assertion that BOP officials lacked the authority to re-incarcerate him following his positive drug test, the Government provides evidence from the decision-makers about the policy rationale that prompted them to remove Plaintiff from the community. Mr. Fultz alleges that he "determined Mr. Mansa's removal from the RRC was . . . . in the best interest of the government, staff, inmates, and the contract[.]" Doc. 2g, Declaration of Chad Fultz (May 30, 2017) at ¶13.

Mr. Fultz provides four policy rationales for his determination. First Mr. Mansa received ample notification of BOP's zero tolerance urinalysis policies. *Id*. (Mr. Mansa "signed and/or received no less than five forms and/or notices advising him that he was subject to urine surveillance, and because the ingestion of poppy seeds could cause a urine sample to test positive for drugs, he was not permitted to ingest poppy seeds[.]") Second, Mr. Fultz routinely refuses to "question the finding of a CDC or DHO that is based upon a valid positive drug test result." *Id*. Third, Mr. Fultz declines to overturn CDC or DHO findings unilaterally because Mr. Fultz believes that overturning committee findings in favor of staff recommendations for leniency could "possibly increase the potential for staff corruption and encourage inmates to take drugs

knowing the charge could be expunged if they were to assert that they ingested poppy seeds." *Id*. Fourth, Mr. Fultz considers "the risk of repeated violations, violence, and disruptive conduct in the RRC or the community" when deciding whether to re-incarcerate an inmate who tested positive for drugs. *Id*. Given these policy rationales, Mr. Fultz authorized Plaintiff's removal from his community placement. *Id*.

Mr. Fultz's decision to deny Mr. Mansa's continued RRC placement prompted Community Treatment Coordinator Erik Anderson to issue a "Request for Removal of Provisional § 3621(e)" form. U.S. Dept. of Justice/Bureau of Prisons, Request to Delay, Remove of Reinstate Early Release. Mr. Anderson provided a statutory rationale for Mr. Mansa's removal from the community. *Id*. ("He is no longer able to participate in CTS making him ineligible for a 3621 (e) release."). The underlying statute supports Mr. Anderson's interpretation. The statute states, in part: "the Bureau shall periodically test the prisoner for substance abuse and discontinue such conditions [of confinement, e.g., community release] on determining that substance abuse has recurred." 18 U.S.C. § 3621. Thus, the plain language of the statute supports Mr. Anderson's issuance of the "Request for Removal of Provisional § 3621(e)" form, which led to Mr. Mansa's re-incarceration following his positive substance abuse test result.

Mr. Norwood also provided his policy reasons for denying Mr. Mansa's appeal. Mr. Norwood reviewed the evidence and found that the Center Disciplinary Committee "reasonably determined you committed the prohibited act [.]" Norwood Decision at 2. As explained above, Mr. Norwood then offered the policy rationale against allowing inmates to retest at the facilities of their choice, including "confirmation testing" and "chain of custody" issues. *Id*. Mr. Norwood upheld the Center Disciplinary Committee's decision on both factual and policy grounds, finding

that "[t]he decision of the CDC was based upon the greater weight of the evidence, and the sanctions imposed by the DHO were consistent with the severity level of the prohibited act." *Id.*

On this record, Mr. Mansa has not created a genuine issue of fact on any alleged clear abuse of discretion. The Government, however, has provided credible evidence that Mr. Fultz, Mr. Anderson, and Mr. Norwood made reasoned decisions grounded in policy rationales, such as deterrence of corruption, community safety, proper statutory construction, and punitive consistency. For these reasons, Mr. Mansa's recovery in negligence is barred by the discretionary function exception to the Federal Tort Claims Act. 29 U.S.C. § 2680(a); *In re World Trade Ctr. Disaster Site Litig.*, 521 F.3d 169, 190 (The discretionary function exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals . . . . The FTCA discretionary function exception is thus a form of retained sovereign immunity.").

Mr. Mansa's final claim, that he was "exonerated" on appeal, is wholly unsupported. No evidence in the record substantiates Mr. Mansa's claim. Rather, it supports a finding that BOP exercised its discretion to move Mr. Mansa from one place of imprisonment to another.

The Bureau of Prisons has the authority to "designate the place of [a] prisoner's imprisonment," 18 U.S.C.§ 3621(b), and to alter the conditions of confinement and release. 18 U.S.C.§ 3621(b)(5). *See also*, *Lopez v. Davis*, 531 U.S. 230, 241 (2001) (Explaining that BOP retains discretion to incarcerate—rather than release—an inmate who has successfully completed a drug treatment program, because "the Bureau thus has the authority, but not the duty, both to alter the prisoner's conditions of confinement and to reduce his term of imprisonment."). Community-based drug treatment programs are considered "places of imprisonment." *Levine v.*,

455 F.3d 71, 82, n8 (2d Cir. 2006) ("Apart from that restriction, we in no way suggest that the BOP must make a particular form of 're-entry' facility, like a CCC, available. But the BOP has not closed CCCs, thus dropping them from the roster of available 'place[s] of imprisonment,' i.e., 'penal or correctional facilities.' And, since they are available, the BOP must comply with the factors made mandatory by Congress in assigning prisoners to them."); *see also*, *Hollman v. Lindsay*, No. 08-CV-1417(NGG), 2009 WL 3112076, at *9 (E.D.N.Y. Sept. 25, 2009) (Explaining that inmates have no constitutional right to placement in a drug rehabilitation program, generally.).

On December 3, 2014, the Acting Administrator of National Inmate Appeals concurred with the CDC, Mr. Fultz, and Director Norwood that Mr. Mansa had "committed the prohibited act of Use of Drugs[.]" Administrative Remedy No. 787778-A1 (Dec. 3, 2014), ECF No. 23-6. The Acting Administrator stated that, after further review, he would partially grant Mr. Mansa's appeal and reduce his 112 incident to a "a 309, violating a condition of a community program." Administrative Remedy No. 787778-A1 (Dec. 3, 2014), ECF No. 23-6; *see also*, U.S. Dept. of Justice/Fed. Bureau of Prisons, Request to Delay, Remove or Reinstate Early Release, ECF No. 23-7. The reduction cleared the way for Mr. Mansa's transfer to a community-based "place of imprisonment."

There is nothing in the record to suggest the Acting Administrator questioned Mr. Fultz's or Mr. Anderson's classification of Mr. Mansa's positive drug test as a "112 violation", or found the 112 classification out of policy or an abuse of discretion. *Id*. The Acting Administrator did not criticize Mr. Norwood's rationale as unfounded or against policy. *Id*.

The Acting Administrator concurred with local and regional officials' findings regarding Mr. Mansa's positive drug test, but nevertheless exercised his or her discretion to treat Mr. Mansa's infraction as a Code 309, a lesser violation of his supervised release. The code reduction was the remedy Mr. Mansa sought at the time. Federal Bureau of Prisons, Central Office Admin. Remedy Appeal: Mark Mansa, Sept. 8, 2014, ECF No. 23-6. The favorable appeal demonstrates that Mr. Mansa enjoyed due process[4] and that BOP was willing to review and review again the decisions of BOP officials to his benefit. Without exonerating him for his positive drug test, the appeal gave Mr. Mansa a second chance at a community placement and drug treatment services.

Significantly, even after his appeal to the Acting Administrator for National Inmate Appeals, BOP released Mr. Mansa from detention well before the completion of his original forty-six month sentence. Defs. Mot. to Dismiss or for Summ. J. at 14. Mr. Mansa also received a second chance at a community placement and home incarceration. *Id.*

---

[4] Mr. Mansa alleges that he was denied a DHO hearing. Mr. Mansa, however, was not entitled to a DHO hearing because the Center Disciplinary Committee did not request one. *See* Center Discipline Committee Report, Doc. 2e, ECF No. 23-11, at 4. Under the guiding regulations, "[t]he Discipline Hearing Officer (DHO) will only conduct a hearing on the incident report if referred by the UDC [Unit Discipline Committee]." 28 C.F.R. § 541.8; *see also Wolff v. McDonnell*, 418 U.S. 539, 556 (1974) ("Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply."). In this case, the DHO merely reviewed and "certified the CDC hearing", as he was asked to do. Administrative Remedy No. 787778-A1 (Dec. 3, 2014), ECF No. 23-6 As explained by Acting Administrator of National Inmate Appeals:

> In regards to your issue of not receiving a DHO report, you received an in-person hearing with the CDC and made a statement. The CDC hearing paperwork was forwarded to the DHO for review and certification pursuant to policy. The DHO completed his review and certified the CDC hearing. You received a copy of the CDC report advising you of the decision and sanctions imposed at that time. You are not entitled to an in-person DHO hearing or a separate DHO report.

Administrative Remedy No. 787778-A1. The Court also notes that Mr. Mansa waived representation by Center staff at his CDC hearing. U.S. Dept. of Justice/Fed. Bureau of Prisons, Notice of Center Discipline Committee Hearing [BP-S2707.073, Rev. Mar. 1994 (June 16, 2014)].

Because Mr. Mansa has not provided evidence in this record to support an inference that Mr. Fultz, Mr. Anderson, Mr. Norwood, or any other BOP official violated BOP policy, Mr. Mansa's claim of negligence must be dismissed as a matter of law.

## IV.    CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment, ECF No. 23, is **GRANTED**.

The Clerk of the Court is respectively requested to close the file.

**SO ORDERED** at Bridgeport, Connecticut, this 7th day of January, 2019.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE